IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| NOAH TECHNOLOGIES | ) | |
| CORPORATION, | ) | |
| | ) | |
|           Plaintiff, | ) | Case No. 05-1817-KI |
| | ) | |
|    vs. | ) | OPINION AND ORDER |
| | ) | |
| WASHINGTON DEMILITARIZATION | ) | |
| COMPANY and WASHINGTON | ) | |
| DEMILITARIZATION COMPANY, LLC, | ) | |
| | ) | |
|          Defendants. | ) | |

       Nena Cook
       Elizabeth A. Semler
       Sussman Shank LLP
       1000 S. W. Broadway, Suite 1400
       Portland, Oregon  97205-3089

            Attorneys for Plaintiff

Gary D. Babbitt
Kim C. Stanger
Thomas J. Mortell
Lynnette M. Davis
Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P. O. Box 1617
Boise, Idaho 83701-1617

  Attorneys for Defendants

KING, Judge:

  NOAH Technologies Corporation ("NOAH") brings a breach of contract action arising out of an invitation to bid issued by Washington Demilitarization Company and Washington Demilitarization Company, LLC (collectively, "WDC"). Before me is Plaintiff's Motion for Summary Judgment (#8), and Defendants' Alternative Motion Under Rule 56(f) (#17). For the following reasons, I deny plaintiff's motion and deny as moot defendants' motion.

## BACKGROUND

  On February 13, 2002, WDC issued an Invitation to Bid to NOAH. WDC's Invitation to Bid included a Proposal Form and incorporated by reference various attachments, including the Purchase Order Terms and Conditions. On February 20, 2002, NOAH submitted a Bid to WDC using WDC's Proposal Form. NOAH's Bid included a provision describing NOAH's returned chemical re-stock fee. The provision read:

 * * Returned Chemical Re-Stock Fee:

 NOAH will accept the return of unused virgin material provided that they are in their original seal packaging and are unopened. A charge will be made equal to 50% of the price quoted for the sale of the material to WDC. The transportation of the unused materials is included in this charge.

Page 2 - OPINION AND ORDER

For materials that have been opened and not in original seal containers will be
accepted for disposal and a charge of 1.5 times the selling price will apply.

Affidavit of I. Bob Blumenthal in Support of Plaintiff's Motion for Summary Judgment

("Blumenthal Aff."), Ex. 3 at 3 (grammatical errors in original).

On April 23, 2002, WDC issued to NOAH its Purchase Order No. POUM 2201234

("Purchase Order") relating to the purchase of certain chemicals.  Line 12 on the first page of the

Purchase Order contained the following statement, "Unusued Trichlorobenzene and

Perchloroethylene to be returned to supplier."  Blumenthal Aff., Ex. 4 at 1.

NOAH sent WDC a letter on or about April 24, 2002 notifying WDC that the Purchase

Order was incorrect.  Specifically, NOAH notified WDC that the Purchase Order omitted

reference to the returned chemical re-stock fee for Trichlorobenzene and Perchloroethylene.

Blumenthal Aff., Ex. 5 at 1 ("Line 12:  Please note the return of unused TCB & PERC is

according to our quote dated 20FEB02.").

On April 26, 2002, WDC issued Modification Order No. 1, making a number of

corrections to the Purchase Order.  On May 7, 2002, WDC issued Modification Order No. 2,

making additional corrections to the Purchase Order.  Specifically, it reiterated the returned

chemical re-stock fee provision previously included in NOAH's bid.

On May 10, 2002, NOAH began delivering chemicals to WDC in accordance with the

Purchase Order and Modification Order Nos. 1 and 2.  WDC accepted all chemicals shipped by

NOAH.

On December 6, 2003, WDC issued to NOAH Modification Order No. 6 to the Purchase

Order.  The cover page accompanying Modification Order No. 6 stated, "The attached

Modification 6 (POUM 2201234) is awarded to cancel and Close-out any/all remaining balances

on this purchase odrer [sic].  All new requirements will be processed by requisition as our system

demands.  Dawn Moreland is preparing a purchase order to handle the remaining and future

demurrage."  Blumenthal Aff., Ex. 8 at 1.

On December 12, 2003, NOAH sent a letter to WDC acknowledging receipt of

Modification Order No. 6 and stating that the settlement of the issues raised by Modification

Order No. 6 would be "conducted according to Section 5.0 of WDC Purchase Order Terms and

Conditions received with the original purchase order."  Aff. of Bonnie Cole in Opposition to

Plaintiff's Motion for Summary Judgment and in Support of Defendants' Motion for Summary

Judgment[1] ("Cole Aff."), Ex. 5 at 1.  The letter went on to explain,

> This is the current situation with the outstanding products.  According to Section
> 5.1 our company is entitled to $329,302.84.
>
> The chemicals that were cancelled are all hazardous and do not have a free and
> ongoing market.  We, therefore, cannot resell these products.
>
> Due to the cancellation these chemicals must be disposed of in a legally
> acceptable manner according to all federal, state and local laws.  We are arranging
> to solicit quotations on the disposition of these chemicals.  These claims for extra
> costs will be supported by appropriate cost documentation as required.

Id. at 2.

> Section 5.1 of the Purchase Order Terms and Conditions provides:
>
> Buyer [WDC] shall have the right to terminate all or part of this Order for its
> convenience.  Upon termination, Seller [NOAH] shall be reimbursed for its
> reasonable and necessary costs resulting therefrom which are substantiated by
> evidence satisfactory to Buyer.  Such reimbursable costs shall be based upon the
> nature and extent of performance and goods, used or spoiled, plus a reasonable

---

[1]This appears to be a labeling error.  WDC is not seeking summary judgment.

Page 4 - OPINION AND ORDER

profit thereon. Seller shall receive no profit on unperformed work. Buyer shall be entitled to immediate possession of plans and work that it pays for.

Blumenthal Aff., Ex. 2 at 3.

On January 5, 2004, NOAH sent to WDC its two-page Invoice No. B-268444 identifying $329,302.90 as due and owing. The invoice listed the chemical name, the unit price, the amount ordered in pounds, and the amount due for each chemical. According to WDC, it repeatedly requested backup documentation relating to the charges in the invoice but NOAH failed to produce such documentation.

In February 2005, WDC began returning to NOAH chemicals and metal totes in which chemicals had been stored and NOAH accepted the returned totes and chemicals from WDC.

## ADDITIONAL FACTS

WDC alleges the following additional facts, to which NOAH does not specifically respond. I note, as does WDC, that in failing to respond to WDC's additional facts, NOAH may be deemed to have admitted them pursuant to Local Rule 56.1(f). Nevertheless, I regard a concise statement only as a roadmap to the evidentiary record unless specific parts are admitted by the opposing side. I do caution counsel, however, that I expect the Local Rules to be followed unless the court grants permission for a variance. Since it is clear from NOAH's reply brief that it disputes some of these facts, I will not consider the facts to be deemed admitted by NOAH.

According to WDC, in approximately September of 2004, NOAH and WDC entered into discussions regarding the return to NOAH of certain metal totes that were being used by WDC to store the remainder of the chemicals they had obtained from NOAH.[2] During the course of these

---

[2]According to NOAH's briefing, the parties began negotiating tote rental fees as early as December, 2002.

Page 5 - OPINION AND ORDER

discussions, NOAH represented to WDC that it had a customer who would accept the chemicals if testing demonstrated that the chemicals had not been contaminated.

According to WDC, during the course of these discussions, WDC and NOAH negotiated and entered into a separate agreement relating to the return of chemicals by WDC to NOAH. Pursuant to the terms of that purported agreement, WDC was not required to pay any fees or costs, including any return or re-stock fees, except for the transportation costs associated with shipping the totes and chemicals to NOAH.

On February 14, 2005, WDC shipped samples of the chemicals to NOAH for testing. On or about March 2, 2005, NOAH informed WDC that the samples had been approved and that NOAH would accept the remaining totes and chemicals from WDC. Starting on or about March 3, 2005, WDC began returning the remaining totes and chemicals to NOAH pursuant to the subsequent agreement between WDC and NOAH. WDC paid all transportation costs associated with shipping the totes and chemicals, including without limitation the samples and the empty totes.

On August 16, 2005, NOAH sent WDC two invoices. The first invoice (Invoice No. CM-0289157) reversed the charges relating to the January 5, 2004 invoice (Invoice No. B-268444) that NOAH sent to WDC immediately following the termination of the Purchase Order, in the amount of $329,302.90. The second invoice (Invoice No. B-0289146), in the amount of $348,627.83, was for re-stocking fees for the return of chemicals in February and March 2005. NOAH's letter accompanying the invoices explained, "When Washington Demilitarization Company (WDC) cancelled P.O. POUM 2201234 our invoice B-268444 was rendered for the applicable charges known to us at that time. Since then there have been a number of additional

Page 6 - OPINION AND ORDER

developments that influenced the applicable charges.  For good orders sake, we have issued a credit memo for the original invoice and a new final invoice for the total."  Cole Aff., Ex. 8 at 1.

According to WDC, immediately after the receipt of the invoice, WDC contacted NOAH and informed NOAH that (1) the Purchase Order had been terminated in December 2003; (2) WDC had reached a subsequent agreement with NOAH regarding the return of the totes and chemicals; and (3) pursuant to the terms of the subsequent agreement, WDC was not required to pay any return or re-stock fees relating to the return of the totes and chemicals.

WDC filed a reply in support of its Motion Under Rule 56(f).  Although I agree with NOAH that the "reply" addresses issues beyond the scope of WDC's initial motion, such that it is more properly labeled a sur-reply to plaintiff's motion for summary judgment, I will accept and consider the arguments in the brief as it clarifies WDC's position and is helpful to the court.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The initial burden is on the moving party to point out the absence of any genuine issue of material fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party.  Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.    <u>NOAH's Motion for Summary Judgment</u>

Under Oregon law, the interpretation of a contract is a question of law for the court.

<u>Hoffman Construction Co. v. Fred S. James & Co.</u>, 313 Or. 464, 469, 836 P.2d 703 (1992).  The

court's goal is to give effect to the intention of the contracting parties.  <u>Anderson v. Jensen</u>

<u>Racing, Inc.</u>, 324 Or. 570, 575-76, 931 P.2d 733 (1997); ORS 42.240 (in the construction of a

written instrument the intention of the parties is to be pursued if possible).

NOAH asserts there is no dispute that it and WDC had a written contract, consisting of

the Bid Proposal and the Purchase Order as amended by Modification Orders No. 1 and No. 2.

NOAH also contends that it is undisputed that pursuant to these agreements, if WDC returned

any of the chemicals NOAH was entitled to recover a returned chemical re-stock fee.  WDC did

not pay the fee after NOAH accepted returned chemicals, and as a result NOAH argues it is

entitled to judgment in the amount of $348,627.83 as set forth in the second invoice (Invoice No.

B-0289146).  At oral argument, NOAH confirmed that it is not making any claim for any

amounts identified in the January 5, 2004 invoice (Invoice No. B-268444), which did not contain

any re-stock fees.  In addition, NOAH clarified that the second invoice does not contain any

charges other than the re-stock fees.

WDC contends that Modification No. 6 terminated the Purchase Order, including the re-

stock fee provision, permitting the parties to enter into a separate oral agreement as to the terms

under which WDC could return chemicals to NOAH.  Even if the re-stock fee provision survives

the termination, WDC argues that the parties orally modified any agreement regarding a returned

chemical re-stock fee.

Page 8 - OPINION AND ORDER

A.    <u>Modification Order No. 6 Terminated the Purchase Order</u>

WDC argues that the contract upon which NOAH relies was terminated more than a year

before WDC returned the chemicals, and is not applicable here.  The only question, according to

WDC, is whether Modification Order No. 6 was a "clear and unambiguous" termination of the

Purchase Order.  <u>See</u> <u>Stovall v. Publishers Paper Co.</u>, 284 Or. 53, 57, 584 P.2d 1375 (1978).

This is a question of law to be decided by the court when the facts are undisputed.  <u>Id.</u> at 63 &

n.5, 584 P.2d 1375.

It is undisputed WDC sent Modification Order No. 6 to NOAH which stated, "[A]warded

to cancel and Close-out any / all remaining balances on this purchase odrer [sic].  All new

requirements will be processed by requisition as our system demands.  Dawn Moreland is

preparing a purchase order to handle the remaining and future demurrage."  Blumenthal Aff., Ex.

8 at 1.  Pursuant to Section 5.1 of the Purchase Order Terms and Conditions, it is also undisputed

that WDC had the right to terminate the Purchase Order.

WDC also contends that subsequent actions taken by the parties demonstrate that

Modification Order No. 6 was viewed by both as a cancellation of the Purchase Order.  In

NOAH's letter of December 12, 2003, NOAH stated that it would issue the closing statement

pursuant to Section 5.1 of the Purchase Order Terms and Conditions, the section that is devoted

solely to terminating the Purchase Order.  In its letter of August 16, 2005, NOAH also referenced

the cancellation of the Purchase Order.  Finally, its Complaint describes the "cancellation" of the

Purchase Order.  Complaint, ¶ 17.

NOAH responds that termination of the Purchase Order had no effect on the re-stock fee

provision.  Modification Order No. 6 did not reference line 12 of the Purchase Order, where the

returned chemical re-stock fee provision appeared.  Modification Order No. 6 simply closed out existing balances.

I agree with WDC that it terminated the Purchase Order, of which the returned chemical re-stock fee provision was a part.  The cover letter accompanying Modification Order No. 6 stated that all new requirements would be processed by requisition as necessary.  WDC had the right under Section 5.1 of the Purchase Order "to terminate all or any part of this Order for its convenience."  NOAH responded with a letter six days later acknowledging that resolution of outstanding balances would be guided by Section 5.1, the provision in the Purchase Order Terms and Conditions dealing solely with termination.  In its August 16, 2005 letter, NOAH stated, "When Washington Demilitarization Company (WDC) cancelled P.O. POUM 2201234 our invoice B-268444 was rendered for the applicable charges known to us at that time."  Cole Aff. Ex. 8 at 1.  The language of Modification Order No. 6 together with the parties' actions afterwards demonstrate that WDC clearly and unambiguously terminated the Purchase Order.

B.    Regardless of the Termination of the Purchase Order, the Re-Stock Fee Provision
       is Ambiguous as to Whether it Survived Post-Termination

Although WDC clearly and unambiguously terminated the Purchase Order, of which the returned chemical re-stock fee provision was a part, this is not the end of the issue.  NOAH argues that by issuing Modification No. 6, WDC avoided any further obligations to purchase chemicals from NOAH, but did not eradicate any continuing obligations under the Purchase Order–such as paying the re-stock fee upon returning the chemicals.  In support of its argument, NOAH offers other examples of provisions in the Purchase Order that impose a post-termination duty on the parties such as the duty to repair and replace non-conforming goods (Section 6.0),

and a duty to comply with "obligations for goods completed prior to the effective date of" any termination (Section 5.4).

"To interpret a contractual provision, . . . , the court follows three steps. First, the court examines the text of the disputed provision, in the context of the document as a whole." Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997). "If the provision is clear, the analysis ends." Id.

> When considering a written contractual provision, the court's first inquiry is what the words of the contract say . . . . To determine that, the court looks at the four corners of a written contract, and considers the contract as a whole with emphasis on the provision or provisions in question. The meaning of disputed text in that context is then determined. In making that determination, the court inquires whether the provision at issue is ambiguous. Whether terms of a contract are ambiguous is a question of law. In the absence of an ambiguity, the court construes the words of a contract as a matter of law.

Id. (quoting Eagle Industries, Inc. v. Thompson, 321 Or. 398, 405, 900 P.2d 475 (1995)).

A contract or term is unambiguous if it has only one sensible and reasonable interpretation. D&D Co. v. Kaufman, 139 Or. App. 459, 462, 912 P.2d 411 (1996). For a contract or term to be legally ambiguous, it must be susceptible to at least two plausible interpretations when examined in the context of the contract as a whole. Moon v. Moon, 140 Or. App. 402, 407, 914 P.2d 1133 (1996).

If the contractual provision at issue is still ambiguous after examining the text and its context, the second step "is to examine extrinsic evidence of the contracting parties' intent." Yogman, 325 Or. at 363. In determining whether an ambiguity exists, the court may consider parol and other extrinsic evidence. Moon, 140 Or. App. at 407.

Page 11 - OPINION AND ORDER

If the first two analytical steps have not resolved the ambiguity, the court proceeds to the

third and final analytical step:  the use of "appropriate maxims of construction."  <u>Yogman</u>, 325 at

364.  This can include the rule that the terms of a contract are construed against the drafter of the

language.  <u>Hoffman Construction Co.</u>, 313 Or. at 470.

Presumably, if the language is still ambiguous, then what the parties intended by that

language is to be decided by the trier of fact.  <u>See</u> <u>Oregon School Employees Ass'n v. Rainier</u>

<u>School District No. 13</u>, 311 Or. 188, 194, 808 P.2d 83 (1991) ("[i]f [contract terms] are

ambiguous, then the trier of fact is to ascertain the intent of the parties and construe the contract

consistently with their intent.");  <u>Yogman</u>, 325 Or. at 364.

The provision at issue provides as follows:

Modification to add language for returned chemicals, re-stock fee.

NOAH will accept the return of unused virgin material provided that they are in
their original seal packaging and are unopened.  A charge will be made equal to
50% of the price quoted for the sale of the material to WDC.  The transportation
of unused material is included in this charge.

For materials that have been opened and not in original seal containers[,]
materials will be accepted for disposal and a charge of 1.5 times the selling price
will apply.

Blumenthal Aff., Ex. 7 at 1.

The language itself does not reveal any intention for it to apply after the Purchase Order

was terminated.  Compared with the provisions NOAH points to as examples of duties that

survive termination, which contain fairly specific language indicating to the reader that the

obligation is a continuing one, the provision at issue is not clear.  For example, the repair or

replace duty requires NOAH to observe the nonconformity within one year from the date the

Page 12 - OPINION AND ORDER

goods are used or two years from the date the goods were shipped.  Blumenthal Aff., Ex. 2 at 3,

Section 6.2.  The other provision NOAH offers as an indication that the parties intended some

duties to extend beyond the termination of the Purchase Order provides, "Termination,

cancellation, or acceptance of goods shall not relieve Seller [NOAH] of its obligations for goods

completed prior to the effective date of such termination, cancellation or acceptance, nor shall it

relieve Seller [NOAH] of its liabilities at law or under the Order."  Id., Section 5.4.  Again, the

language of these provisions more clearly evinces an intention by the parties for the specified

duties to survive termination of the agreement than does the re-stock fee provision.

        However, it is possible to read the re-stock fee provision to apply beyond termination of

the Purchase Order.  It could be read to operate at any time chemicals were returned.  WDC

could perhaps have relied on the provision to require NOAH to accept returned chemicals five

years after it terminated the Purchase Order, if it were less expensive for WDC to pay NOAH to

take the chemicals rather than dispose of them itself.  Accordingly, I conclude under the first step

that it is possible to give the returned chemical re-stock fee provision two equally plausible

meanings.

        Applying the second step, neither party has identified any extrinsic evidence from which I

can glean the intent of the parties at the time the agreement was entered into.  WDC encourages

me to consider the actions of the parties following the termination of the Purchase Order,

asserting that "[t]he parties clearly negotiated the terms of the subsequent return of chemicals and

the agreed upon terms are incongruous with the terms of the Purchase Order."  Defendants'

Reply Memorandum in Further Support of Defendants' Alternative Motion Under Rule 56(f)

("Defendants' Reply"), at 7.  However, extrinsic evidence is properly limited to the

Page 13 - OPINION AND ORDER

circumstances surrounding formation of the contract, as opposed to subsequent actions of the

parties.  Brunick v. Clatsop County, 204 Or. App. 326, 337, 129 P.3d 738 (2006).

Finally, neither party identifies any maxims of contract construction I should consider.

Accordingly, I conclude that, at least at this stage, whether the parties intended the re-stock fee

provision to survive termination of the Purchase Order is ambiguous.  At this point, plaintiff is

not entitled to summary judgment that the re-stock fee provision survived termination.

C.      There is a Material Issue of Fact as to a Subsequent or Modifying Agreement

Regardless of whether the re-stock fee survived termination of the Purchase Order, WDC

has raised a genuine issue of material fact as to either the existence of a new, subsequent

agreement or a subsequent agreement that modified any surviving re-stock fee provision.

Although WDC states in its response, "[WDC] does not assert that the Purchase Order

was altered by the parties or that NOAH waived or modified its right to collect the Re-stock

Fee," it has subsequently clarified that its alternative argument is that "the parties subsequently

modified their agreement regarding the return of chemical [sic] by eliminating the Re-Stock

Fee."  Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment at

14-15; Defendants' Reply at 5, n.1.

According to WDC, following cancellation of the Purchase Order, the parties came to an

accommodation about WDC's extra chemical inventory.  In the midst of negotiations about

renting metal totes to store the remaining chemicals, WDC asked NOAH if it had a customer

who might be interested in purchasing WDC's excess chemical inventory.  William Norris of

WDC discussed the options with Kelly Sellers of NOAH; Norris testifies in an affidavit that he

explained to Sellers that WDC would not return the chemicals to NOAH if NOAH planned to

charge a re-stocking fee.  Norris also testifies that he explained that WDC had less expensive

options for handling the chemicals.

After sending samples of the chemicals to NOAH and having them approved, WDC

returned all the chemicals.  Pursuant to the agreement Norris and Sellers allegedly struck, WDC

was billed for and paid for the transportation costs for the chemicals.  WDC argues this is further

support for its position that the parties had entered into a new agreement or modified the original

agreement because in the original agreement the re-stocking fee included the cost of

"transportation of unused material."  Blumenthal Aff., Ex. 7 at 1.

Although NOAH argues the parties' course of performance demonstrates that the parties

put all agreements in writing–a course of performance that continued when WDC needed to rent

the totes from NOAH after termination of the Purchase Order–this is simply one factor the trier

of fact will have to consider.

In addition, NOAH disputes the meaning of several e-mail communications between

Sellers and Norris, arguing that Sellers never agreed to accept returned chemicals at "no cost."

NOAH points to WDC employee Dawn Moreland's notes after talking with Norris, which state,

"Advised buyer that he had affirmed w/ Noah that there would be no *additional charges* to WDC

when totes are returned.  WDC only needs to pay freight."  Affidavit of Dawn Moreland in

Opposition to Plaintiff's Motion for Summary Judgment ("Moreland Aff."), Ex. 4 of ¶ 10

(emphasis added).  However, an earlier note of Moreland's states, "Buyer received call advising

they have a person to take the PCE off our hands.  *No charge.*  FOB delivered Buffalo, NY."

Moreland Aff., Ex. 2 (emphasis added).  NOAH also offers the declaration of Sellers, who states

that an e-mail of his confirms that he alerted WDC the returned chemical re-stock fee would still

apply.  In the e-mail, Sellers simply quotes the language from Modification Order No. 2.

Declaration of Kelly Sellers in Further Support of Plaintiff's Motion for Summary Judgment, Ex.

1.  Again, this is evidence that must be considered by the trier of fact.

NOAH also points to a provision in the agreement prohibiting oral modification of the

agreement.  Specifically, Section 23.0 provides, "Any additions to or variations from the same

offered by Seller [NOAH] will be deemed proposals for amendment to this agreement and shall

be binding only if made in writing and signed by an authorized representative of Buyer [WDC]."

Blumenthal Aff., Ex. 2 at 6.  WDC has raised a genuine issue of fact that any amendment to the

agreement was initiated by WDC, which would arguably make this provision inapplicable.[3]

Viewing the evidence in the light most favorable to the nonmoving party, there are

sufficient questions of fact as to whether NOAH and WDC entered into a separate agreement for

returning chemicals, or modified the existing agreement, that preclude summary judgment.

II.    WDC's Motion Under Rule 56(f)

Since I deny NOAH's motion for summary judgment, WDC's motion to conduct

discovery under Rule 56(f) is denied as moot.

---

[3]If the provision does apply, WDC mentions an issue about whether any surviving
provisions of the Purchase Order would be reviewed under the common law or under the
Uniform Commercial Code ("UCC").  Under the common law, parties may modify a written
contract orally even if the writing contains an express provision against nonwritten
modifications.  An oral modification of a written contract must be proven by clear and
convincing evidence.  Bennett v. Farmers Insurance Co., 332 Or. 138, 147 n.7, 149, 26 P.3d 785
(2001).  Under the UCC, however, a contract for the sale of goods that "excludes modification . .
. except by a signed writing cannot be otherwise modified."  ORS 72.2090(2).  WDC does note
that "an attempt at modification . . . can operate as a waiver."  ORS 72.2090(4).  This issue has
not been adequately briefed by either party to warrant a decision at this time.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (#8) is denied, and

Defendants' Alternative Motion Under Rule 56(f) (#17) is denied as moot.

IT IS SO ORDERED.

Dated this ___2nd___ day of May, 2006.


      ___/s/ Garr M. King_____

      Garr M. King
      United States District Judge