FILED '07 JAN 18 12:15 USDC-OR

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

NOAH TECHNOLOGIES
CORPORATION,

        Plaintiff,

vs.

WASHINGTON DEMILITARIZATION
COMPANY and WASHINGTON
DEMILITARIZATION COMPANY, LLC,

        Defendants.

Case No. 05-1817-KI

OPINION AND ORDER

Nena Cook
Elizabeth A. Semler
Sussman Shank LLP
1000 S. W. Broadway, Suite 1400
Portland, Oregon 97205-3089

    Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

Gary D. Babbitt
Kim C. Stanger
Thomas J. Mortell
Lynnette M. Davis
Hawley Troxell Ennis & Hawley LLP
877 Main Street, Suite 1000
P. O. Box 1617
Boise, Idaho 83701-1617

Attorneys for Defendants

KING, Judge:

Plaintiff NOAH Technologies Corporation ("NOAH") brings a breach of contract action arising out of an Invitation to Bid issued by defendants Washington Demilitarization Company and Washington Demilitarization Company, LLC (collectively, "WDC"). Before me is WDC's Motion for Summary Judgment (#39). For the following reasons, I grant the motion.

## BACKGROUND

I. Procedural Background

The Court issued an Opinion and Order on May 2, 2006, denying plaintiff's motion for summary judgment. First, I found that WDC had terminated the Purchase Order when it issued Modification Order No. 6. As a result, WDC had terminated the chemical restock fee provision ("Restock Fee"). However, I found that it was unclear from the Restock Fee whether the parties intended it to survive termination, and as a result NOAH was not entitled to summary judgment on this issue. In addition, I found there was a material issue of fact as to whether the parties modified their agreement regarding the Restock Fee, or entered into a subsequent agreement.

II. Factual Background

Page 2 - OPINION AND ORDER

I reiterate many of these facts from the Opinion and Order issued in May of 2006, except where supplemented by the parties' newest submissions.[1]

On February 13, 2002, WDC issued an Invitation to Bid to NOAH. WDC's Invitation to Bid included a Proposal Form and incorporated by reference various attachments, including the Purchase Order Terms and Conditions. On February 20, 2002, NOAH submitted a Bid to WDC using WDC's Proposal Form. NOAH included in its Bid a provision describing NOAH's Restock Fee. The provision read:

> * * Returned Chemical Re-Stock Fee:
>
> NOAH will accept the return of unused virgin material provided that they are in their original seal packaging and are unopened. A charge will be made equal to 50% of the price quoted for the sale of the material to WDC. The transportation of the unused materials is included in this charge.
>
> For materials that have been opened and not in original seal containers will be accepted for disposal and a charge of 1.5 times the selling price will apply.

Aff. of I. Bob Blumenthal in Supp. of Pl.'s Mot. for Summ. J. ("Blumenthal Aff."), Ex. 3 at 3 (grammatical errors in original). This provision was drafted by NOAH's Vice-President, Bob Blumenthal. At the time he drafted the Restock Fee, Blumenthal did not consider whether it would continue to apply if the Purchase Order was cancelled.

On April 23, 2002, WDC issued Purchase Order No. POUM 2201234 ("Purchase Order") relating to the purchase of certain chemicals from NOAH. Line 12 on the first page of the Purchase Order contained the following statement, "Unusued Trichlorobenzene and Perchloroethylene to be returned to supplier." Blumenthal Aff., Ex. 4 at 1.

---

[1] Unless otherwise noted, citations are to materials from the first round of summary judgment briefing.

Page 3 - OPINION AND ORDER

NOAH sent WDC a letter on or about April 24, 2002 notifying WDC that the Purchase Order was incorrect. Specifically, NOAH notified WDC that the Purchase Order omitted reference to the Restock Fee for Trichlorobenzene and Perchloroethylene. Blumenthal Aff., Ex. 5 at 1 ("Line 12: Please note the return of unused TCB & PERC is according to our quote dated 20FEB02.").

On April 26, 2002, WDC issued Modification Order No. 1, making a number of corrections to the Purchase Order, but not the one identified in NOAH's April letter. On May 7, 2002, WDC issued Modification Order No. 2, in which it directly quoted the Restock Fee included in NOAH's Bid.

The Purchase Order Terms and Conditions contained an integration clause stating, in relevant part, "Any additions to or variations from the [Purchase Order] offered by [NOAH] will be deemed proposals for amendment to this agreement and shall be binding only if made in writing and signed by an authorized representative of [WDC]." Blumenthal Aff., Ex. 2 at 6, § 23.0.

On May 10, 2002, NOAH began delivering chemicals to WDC in accordance with the Purchase Order and Modification Order Nos. 1 and 2. WDC accepted all chemicals shipped by NOAH.

On December 6, 2003, WDC issued to NOAH Modification Order No. 6 to the Purchase Order. The cover page accompanying Modification Order No. 6 stated, "The attached Modification 6 (POUM 2201234) is awarded to cancel and Close-out any/all remaining balances on this purchase odrer [sic]. All new requirements will be processed by requisition as our system demands. Dawn Moreland is preparing a purchase order to handle the remaining and future

Page 4 - OPINION AND ORDER

demurrage." Blumenthal Aff., Ex. 8 at 1.

On December 12, 2003, NOAH sent a letter to WDC acknowledging receipt of Modification Order No. 6 and stating that the settlement of the issues raised by Modification Order No. 6 would be "conducted according to Section 5.0 of WDC Purchase Order Terms and Conditions received with the original purchase order." Aff. of Bonnie Cole in Opp'n to Pl.'s Mot. for Sum. J. ("Cole Aff."), Ex. 5 at 1. The letter went on to explain,

> This is the current situation with the outstanding products. According to Section 5.1 our company is entitled to $329,302.84.
>
> The chemicals that were cancelled are all hazardous and do not have a free and ongoing market. We, therefore, cannot resell these products.
>
> Due to the cancellation these chemicals must be disposed of in a legally acceptable manner according to all federal, state and local laws. We are arranging to solicit quotations on the disposition of these chemicals. These claims for extra costs will be supported by appropriate cost documentation as required.

Id. at 2.

Section 5.1 of the Purchase Order Terms and Conditions provides:

> [WDC] shall have the right to terminate all or part of this Order for its convenience. Upon termination, [NOAH] shall be reimbursed for its reasonable and necessary costs resulting therefrom which are substantiated by evidence satisfactory to [WDC]. Such reimbursable costs shall be based upon the nature and extent of performance and goods, used or spoiled, plus a reasonable profit thereon. [NOAH] shall receive no profit on unperformed work. [WDC] shall be entitled to immediate possession of plans and work that it pays for.

Blumenthal Aff., Ex. 2 at 3.

On January 5, 2004, NOAH sent to WDC its two-page Invoice No. B-268444 identifying $329,302.93 as due and owing ("$329,000 invoice"). The invoice listed the chemical name, the unit price, the amount ordered in pounds, and the amount due for each chemical. The invoice

Page 5 - OPINION AND ORDER

represented NOAH's selling price to WDC for unshipped chemicals. WDC repeatedly requested backup documentation relating to the charges in the invoice but NOAH failed to produce such documentation. NOAH asserts that it did not provide the documentation because the parties were negotiating a resolution of many issues, and because it made a proposal in October of 2004 (described further below) that it believed avoided the need to respond.

WDC began investigating alternatives for removing the unused chemicals from the WDC site. WDC contacted NOAH representative Kelly Sellers to determine how much NOAH would charge if WDC shipped the chemicals back to NOAH, but no agreement was reached. On August 17, 2004, Sellers sent an e-mail to a WDC employee stating that he had "located the original contract modification order no. 2" and quoted the Restock Fee. Sellers explained that he sent the e-mail in response to a request from the WDC employee about what NOAH would charge to take the chemicals back.

On October 15, 2004, Sellers sent WDC a letter proposing that, among other things, NOAH would accept return of the chemicals and the totes in which the chemicals were stored if WDC paid the outstanding $329,000 invoice.

WDC did not accept the October 15, 2004 proposal, but it did not communicate to NOAH that it would not accept the proposal.

In or around November 2004, WDC's representative, Dawn Moreland, asked Sellers if NOAH had a customer or vendor who would be willing to accept the chemicals from WDC. As a courtesy to WDC, Sellers agreed to help WDC find someone to take the chemicals by checking with NOAH's customers and vendors. According to NOAH, Sellers did so based on his belief that WDC would pay the outstanding $329,000 invoice.

Page 6 - OPINION AND ORDER

Sellers contacted Chemical Distributors, Inc., who confirmed that it had customers who wanted the chemicals, subject to approval of samples. Moreland authorized WDC employee Bill Norris to work with Sellers to arrange the return of the chemicals.

In March 2005, Sellers notified Norris that the samples had been approved, thereby clearing the way for the return of the chemicals to NOAH for further disposition. Before shipping the chemicals, Norris contacted Sellers to confirm the terms of the return of the chemicals. Specifically, Norris confirmed that WDC would pay the shipping costs and no other "additional costs." NOAH explains that Sellers' statement about "no additional costs" referred to additional costs beyond the $329,000 invoice. WDC relied on Sellers' statements in returning the chemicals to NOAH in March 2005.

WDC had no further communications with NOAH about these issues until August 10, 2005, when WDC's Supply Chain Manager, Carol Ajirogi, called Sellers in an attempt to close the outstanding $329,000 invoice from January 2004.

On August 16, 2005, NOAH sent WDC two invoices. The first invoice (Invoice No. CM-0289157) reversed the $329,000 invoice. The second invoice (Invoice No. B-0289146), in the amount of $348,627.83, was for a Restock Fee for the return of chemicals in February and March 2005. NOAH's letter accompanying the invoices explained, "When Washington Demilitarization Company (WDC) cancelled P.O. POUM 2201234 our [$329,000] invoice was rendered for the applicable charges known to us at that time. Since then there have been a number of additional developments that influenced the applicable charges. For good orders sake, we have issued a credit memo for the original invoice and a new final invoice for the total." Cole Aff., Ex. 8 at 1.

Page 7 - OPINION AND ORDER

According to WDC, immediately after the receipt of the invoice, WDC contacted NOAH and informed NOAH that (1) the Purchase Order had been terminated in December 2003; (2) WDC had reached a subsequent agreement with NOAH regarding the return of the totes and chemicals; and (3) pursuant to the terms of the subsequent agreement, WDC was not required to pay a Restock Fee relating to the return of the totes and chemicals.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.    NOAH's "Evidentiary Objections" to Affidavit of Wallace Whitney

NOAH makes a number of objections to Wallace Whitney's affidavit that are more in the way of argument than evidentiary objections. For instance, NOAH objects to Whitney's statement as to his subjective intent in entering into the contract with NOAH. NOAH also objects to several statements as irrelevant, speculative, or conclusive. I have taken these comments into account in rendering a decision on WDC's motion.

II.    Whether the Restock Fee Survived Termination of the Purchase Order

As explained above, in the Opinion and Order of May 2006, I determined that WDC terminated the Purchase Order, of which the Restock Fee was a part, but I concluded that the Restock Fee was ambiguous as to whether it survived termination of the Purchase Order.[2]

WDC asks me to complete the analytical framework applicable to contract interpretation under Oregon law. Under that framework, if the court determines a provision to be ambiguous, the court must "examine extrinsic evidence of the contracting parties' intent." Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997). If the ambiguity is not resolved, the court uses "appropriate maxims of construction." Id. at 364. WDC asks the court to consider the extrinsic evidence and apply maxims of construction to conclude that the Restock Fee did not survive termination of the Purchase Order.

According to WDC, at the time the Restock Fee was drafted, NOAH had formed no intent as to whether it would apply after the Purchase Order was terminated. NOAH's Vice-President Blumenthal drafted the provision, and testified in his deposition that he did not consider what would happen to the provision if the Purchase Order was cancelled. Blumenthal Depo. 62:24-63:3, Oct. 5, 2006. Whitney, WDC's representative, however, understood that it would terminate with the cancellation of the Purchase Order. Whitney Aff. ¶ 5.

In addition, WDC urges the court to apply the maxim of construction that would resolve ambiguous terms against the drafter. North Pacific Ins. Co. v. Hamilton, 332 Or. 20, 24, 22 P.3d 739 (2001). Since the term was crafted by NOAH, its interpretation should not be followed.

NOAH responds that its understanding of the provision, referring to the testimony of

---

[2] Accordingly, I do not consider any argument about the ambiguity of the Restock Fee or about whether Modification Order No. 6 terminated the provision.

Page 9 - OPINION AND ORDER

Sellers, was that the Restock Fee would apply if WDC returned chemicals to NOAH, and would apply regardless of the cancellation of the Purchase Order. In addition, Diane Milner, Marketing Manager for NOAH, testifies in an affidavit that the

> Restock Fee was included in NOAH's Bid to address the scenario where chemicals are returned after a purchase order has been exhausted or where a purchase order is terminated before a client uses all of the chemicals on hand. The entire purpose for the Re-stock [sic] Fee would be lost if that provision became unenforceable simply because a buyer exercised its option to terminate its obligation to make further purchases.

Amended Aff. of Diane Y. Milner ¶ 9. Milner was the employee charged with obtaining the corrections to the Purchase Order to include the Restock Fee.

Finally, NOAH relies on ORS 42.260, which provides in relevant part that ambiguous terms should be construed to uphold the construction "which is most favorable to the party in whose favor the provision is made." According to NOAH, the Restock Fee was intended to favor it, and accordingly, its interpretation should rule.

I agree with WDC that there is no evidence as to the intent of the parties at the time the Restock Fee was drafted as to whether the provision would survive termination of the Purchase Order. Sellers' and Milner's thoughts about the meaning of the provision are irrelevant since neither of them were involved in crafting the provision. Similarly, Whitney's belief as to its meaning is also irrelevant. The one who drafted the Restock Fee, Blumenthal, admitted he "did not consider" what would happen to the Restock Fee if the Purchase Order was cancelled. Blumenthal Depo. 62:25- 63:3. The Restock Fee was not standard language for NOAH. Blumenthal had never used the provision in any other contract. As a result, there is no extrinsic evidence of whether the parties intended the Restock Fee to survive termination of the Purchase

Page 10 - OPINION AND ORDER

Order at the time of contracting.³

NOAH urges me to consider how the parties conducted themselves under the contract, citing Yogman. Indeed, Yogman mentions that the parties' "practical construction of an agreement may hint at their intention." 325 Or. at 364, citing Tarlow v. Arntson, 264 Or. 294, 300, 505 P.2d 338 (1973) ("How the original parties and their successors conducted themselves in relation to the agreement is instructive in our determination of what must have been intended."). However, the only such evidence offered by NOAH is Sellers' August 2004 e-mail, in which he quotes the language of the Restock Fee. Sellers' reference to the Restock Fee after cancellation of the Purchase Order sheds no light on *the parties'* interpretation of the provision, only on NOAH's interpretation. NOAH offers no evidence that WDC believed the Restock Fee continued to apply after it terminated the Purchase Order. Indeed, if anything, the parties' course of performance was inconsistent with application of the Restock Fee. WDC made multiple shipments of chemicals to NOAH. The first time NOAH made a demand under the Restock Fee came five months after the last chemicals were shipped.

I do not view ORS 42.260 to be helpful. Although NOAH argues the Restock Fee benefitted it, I find that the provision could also be read to have benefitted WDC. Under the provision, WDC had the option of returning chemicals, whereas NOAH had the obligation of accepting them. If WDC did not want to pay the Restock Fee it could choose to dispose of the chemicals via other means.

---

³I note that the standards in the industry might be that such a provision would survive termination of a contract. However, NOAH does not raise this argument, and there is no evidence that Blumenthal considered standard restock fee provisions in drafting the provision at issue here.

Page 11 - OPINION AND ORDER

Accordingly, the question becomes whether to apply the maxim of construction in which I construe the provision against the drafter. See Hoffman Construction Co. v. Fred S. James & Co., 313 Or. 464, 469, 836 P.2d 703 (1992). NOAH argues that the maxim should not apply where, as here, the drafter was asked by the other party to create the provision, and it was included in a form contract where all the remaining provisions were drafted by the other party. NOAH argues it is being punished for contracting in good faith.

I find that this is an appropriate situation to construe the language against the drafter. NOAH was in the best position to prevent the ambiguity, and was directly responsible for the disputed language. In this circumstance, it does not matter that it was included in a form contract created by WDC. Furthermore, WDC essentially invited NOAH to include a restock fee provision in the Invitation to Bid, but did not specifically request one.[4] NOAH had the opportunity to declare that the Restock Fee would apply even after NOAH was no longer supplying chemicals to WDC, or to indicate some other applicable timeframe, and it did not do so.

Contrary to NOAH's belief that interpreting the Restock Fee to terminate upon cancellation of the Purchase Order removes meaning from the provision, I find it to be perfectly plausible that, in this context, the provision would apply to chemicals returned before the Purchase Order was cancelled.

Since NOAH has provided no extrinsic evidence that sheds light on the meaning of the

---

[4]The Invitation to Bid contained a section on pricing, requiring NOAH to write in the base bid price, the price for freight, etc. The section contained the following phrase, "Returned Chemicals Re-Stock Fee (if applicable)" with a place for NOAH to write in the amount. NOAH wrote in, "See Note on page 9 of 9" and placed the Restock Fee language on page 9.

Page 12 - OPINION AND ORDER

Restock Fee, and since I have construed the provision against the drafter, I find that the Restock Fee did not survive cancellation of the Purchase Order.

III.     Whether the Parties Entered into a New Agreement

In the May 2006 Opinion and Order, I found a material issue of fact existed as to whether the parties had modified the Restock Fee or agreed to new terms regarding the return of chemicals.

I find now that even if the Restock Fee survived termination of the Purchase Order, NOAH agreed not to charge the fee in accepting the chemicals. NOAH's employee, Sellers, testified that he agreed WDC could return the chemicals, and he assumed that in return WDC would pay the original invoice of $329,000. Specifically, NOAH's employee, Sellers, testified as follows:

Q:     [Y]our understanding was that WDC would pay that [$329,000] invoice and NOAH would take back the chemicals at no additional charge?

A:     That is correct.

Sellers Depo. 114:2-5, August 30, 2006. In addition, NOAH required WDC to pay the fees associated with transporting the chemicals to NOAH. The Restock Fee explicitly states, "The transportation of the unused materials is included in this charge." Blumenthal Aff., Ex. 3 at 3. The undisputed facts show that NOAH accepted the chemicals without anticipating that the Restock Fee would apply.

Furthermore, I find that although NOAH believed that WDC would pay the outstanding $329,000 invoice in return for NOAH's acceptance of the returned chemicals, NOAH's only express articulation of this offer was never accepted by WDC. In October of 2004, NOAH sent

Page 13 - OPINION AND ORDER

an offer to WDC via letter in which it proposed to accept WDC's chemicals if WDC paid the outstanding $329,000 invoice. There is no evidence that WDC ever accepted the proposal, as conceded by Sellers as well as by NOAH's Vice-President Blumenthal. Sellers testified:

Q: Did [WDC] ever come back and tell you that they agreed to the terms in the October 15, 2004, letter?

A: They never declined it or accepted it.

Sellers Depo. 181:23-182:1. Similarly, in response to the question whether WDC ever accepted the October proposal, Blumenthal testified that it did not. Blumenthal Depo. 41:20-21, Oct. 5, 2006.

In addition, WDC cannot be deemed to have accepted the October 2004 proposal simply because it sent the chemicals back. Even NOAH conceded that multiple communications between the two companies took place from November 2004 through March 2005 about "return of the unused chemicals to NOAH, we well as about other possible disposal options for WDC." NOAH's Memo. in Opp. at 6. Given these intermittent discussions, return of chemicals in March of 2005 can hardly be deemed an "unconditional manifestation of the [offeree's] determination to accept" an offer from October of 2004. Larson v. Trachsel, 282 Or. 247, 251, 577 P.2d 928, 930 (1978) (internal quotation marks omitted).

Accordingly, even if the Restock Fee survived cancellation of the Purchase Order, the parties entered into a new agreement that WDC would not be subject to the provision. The parties never came to any agreement as to whether WDC would be required to pay the $329,000 invoice.

I reject NOAH's argument that the Purchase Order's integration clause or WDC's own

Page 14 - OPINION AND ORDER

procurement process changes the outcome.

By its terms, the integration clause only prohibited oral modifications offered by NOAH, not amendments offered by WDC. Section 23.0 reads: "Any additions to or variations from the [Purchase Order] offered by [NOAH] will be deemed proposals for amendments to this agreement and shall be binding only if made in writing and signed by an authorized representative of WDC." Cole Aff., Ex. 2 at 17. It was WDC's proposal to return the chemicals without application of the Restock Fee.

Since any oral modification to the agreement did not violate this integration clause, NOAH's argument based on the UCC rule against oral modifications is inapplicable. The UCC rules provides, "A signed agreement which excludes modification or rescission except by a signed writing cannot be <u>otherwise</u> modified or rescinded . . . ." ORS 72.2090(2) (emphasis added). Since the oral modification here was not prohibited by the parties' agreement, it was not barred by the UCC.

Finally, WDC's procurement process does not change the analysis. Although, WDC's procurement process requires "written authorization to add, delete, modify or otherwise change the requirements of the original agreement," Memo. in Opp. at 15, and restricted personnel who were permitted to enter into contracts, WDC's internal procedures were not part of the parties' agreement. The issue is not whether WDC complied with its own procedures, only whether WDC and NOAH complied with the terms of their agreement.

In conclusion, I find that NOAH has raised no material issue of fact that would preclude summary judgment in WDC's favor. It agreed to accept the chemicals without requiring WDC to pay the Restock Fee. Whether it believed WDC would pay the outstanding $329,000 invoice is

Page 15 - OPINION AND ORDER

irrelevant. It was a secret, unexpressed desire that cannot form the basis for a contract, and NOAH's only written articulation of this offer was never accepted by WDC.

## CONCLUSION

Based on the foregoing, WDC's Motion for Summary Judgment (#39) is granted.

IT IS SO ORDERED.

Dated this 18TH day of January, 2007.

*/s/ Garr M. King*
Garr M. King
United States District Judge